**WO**                                                                                                    SC

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard L. Ramsdell, | No. CV 10-0052-PHX-GMS (ECV) |
| Plaintiff, | **ORDER** |
| vs. | |
| Charles Ryan, et al., | |
| Defendants. | |

Plaintiff Richard L. Ramsdell brought this case pursuant to 42 U.S.C. § 1983 against various employees of the Arizona Department of Corrections (ADC); Canteen Correctional Services (CCS), a private contractor for ADC; and Linda Ahumada, a CCS employee.[1] (Doc. 1.) Plaintiff also filed a motion for injunctive relief. (Doc. 3.) On screening, the Court ordered Defendants Kendall, Baird, Bradley, CCS, and Ahumada to respond to the motion and Counts I and II of the Complaint. (Doc. 6.) ADC Defendants Kendall, Baird, and

---

[1] At times relevant to Plaintiff's Complaint, Plaintiff was incarcerated at the Arizona State Prison Complex-Eyman, Rynning Unit, in Florence, Arizona. Plaintiff was transferred to the Tucson-Winchester Complex in April, 2010. (Doc. 29.)

1  Bradley filed a motion to dismiss for failure to exhaust administrative remedies as required
2  by the Prison Litigation Reform Act (PLRA), which Defendants CCS and Ahumada joined,
3  and all Defendants have opposed Plaintiff's motion. (Doc. 24, 28.) Both motions are fully
4  briefed.[2] (Doc. 24, 28, 33, 34, 36.) The Court will grant Defendants' motion to dismiss,
5  deny Plaintiff's motion, and dismiss this action without prejudice for failure to exhaust.

**I.  Background**

Plaintiff filed this action on January 8, 2010, alleging violation of his Eighth Amendment rights to medical care and basic necessities. Plaintiff alleged the following:

Since 2000, Plaintiff has suffered from diabetes, high blood-pressure, and peripheral artery disease. Since 2008, Plaintiff has been incarcerated by ADC. At that time, Plaintiff was 67 years old and weighed 175 lbs.

In early 2009, Plaintiff began losing weight. On June 16, 2009, Dr. Belcourt placed Plaintiff on a regular diet with two protein supplements due to a 10 lbs. weight loss. In July 2009, Plaintiff became very ill with nausea, dizziness, vomiting, diarrhea, and fever. Dr. Belcourt ordered blood-work to determine whether Plaintiff's gall bladder was causing his symptoms. On July 13, 2009, Dr. Belcourt ordered that Plaintiff be given a Kosher diet because Plaintiff was able to eat the types of foods in the Kosher diet without becoming ill. Plaintiff's symptoms markedly improved on the Kosher diet.

On July 28, 2009, Dr. Belcourt received Plaintiff's lab results and ordered surgery. On July 31, 2009, Plaintiff was taken to the hospital and his gall bladder was removed. Dr. Belcourt prescribed that Plaintiff continue to receive a Kosher diet until September 17, 2009, for medical reasons. After his return to the Rynning Unit on August 3, Plaintiff received a

---

[2] Plaintiff filed an initial response to Defendants' motion to dismiss, apparently prior to his receipt of an Order informing him of the obligation to respond and the evidence necessary to successfully rebut Defendants' contentions, pursuant to Wyatt v. Terhune, 315 F.3d 1108, 1120 n. 14 (9th Cir. 2003). Defendants filed a reply to Plaintiff's initial response to their motion to dismiss. (Doc. 34.) Plaintiff then filed a supplemental response. (Doc. 36.) Defendants have filed a motion to strike Plaintiff's supplemental response. (Doc. 37.) Defendants' motion to strike will be summarily denied.

Kosher diet for one day before Defendant Ahumada cancelled it because CCS policy did not allow inmates to receive a religious diet for medical reasons.

On August 12, 2009, the medical unit ordered an ova-lacto vegetarian diet for Plaintiff, which Ahumada also refused to provide pursuant to CCS policy. Plaintiff informed Ahumada that his gall bladder had been removed and that he could only eat fruits, vegetables, whole grains, and wheat without becoming sick. Ahumada told Plaintiff that she did not care and that "'Rules are rules.'" (Doc. 1 at 3B.) Assistant Deputy Warden Bradley purportedly agreed with Ahumada's refusal to provide a Kosher diet prescribed for Plaintiff.

On September 21, 2009, Dr. Wohler examined Plaintiff and noted that Plaintiff had lost another 15 lbs. (Id.) Dr. Wohler prescribed a Kosher diet for Plaintiff for medical reasons. Ahumada again refused to provide a Kosher diet to Plaintiff.

Plaintiff alleges that despite two medical orders that he be provided with a Kosher diet for medical reasons, the Defendants refused to comply. Plaintiff alleges that as a result, he has been unable to eat the meals provided without becoming ill and continued to lose weight – over 35 lbs in less than a year. He also alleged that due to the removal of his gall bladder, he is no longer able to eat starchy or high fat foods and is unable to eat much of the food provided in the regular diet without becoming sick. Defendants contend that Plaintiff failed to properly exhaust his claims.

**II.    Exhaustion**

The PLRA provides that a prisoner may not bring a lawsuit with respect to prison conditions under § 1983 unless all available administrative remedies have first been exhausted. See 42 U.S.C. § 1997e(a); Vaden v. Summerhill, 449 F.3d 1047, 1050 (9th Cir. 2006); Brown v. Valoff, 422 F.3d 926, 934-35 (9th Cir. 2005). He must complete the administrative review process in accordance with the applicable rules. See Woodford v. Ngo, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, Porter v. Nussle, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, Booth v. Churner, 532 U.S. 731, 741 (2001).

Exhaustion is an affirmative defense. Jones v. Bock, 549 U.S. 199, 216 (2007).

Defendants bear the burden of raising and proving the absence of exhaustion. Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003). Because exhaustion is a matter of abatement in an unenumerated Rule 12(b) motion, a court may look beyond the pleadings to decide disputed issues of fact. Id. at 1119-20. Further, a court has broad discretion as to the method to be used in resolving the factual dispute. Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988) (quotation omitted).

Defendants have proffered evidence to support ADC had an available grievance procedure, "Department Order: 802 *Inmate Grievance Procedure*" (DO 802). They have submitted a copy of DO 802; declarations from ADC Grievance Coordinator, Eva Sheridan, and ADC Health Services Appeals Officer, Matthew Musson; and copies of Plaintiff's submissions.[3] (Doc. 24.) Plaintiff argues that he properly exhausted under DO 802 by filing an emergency grievance and he has submitted copies of additional documents. (Doc. 33, 36.) Defendants reply that Plaintiff failed to comply with the grievance procedures by *properly* exhausting through the Director level. (Doc. 34.)

## III. ADC Grievance Process

DO 802 sets forth the procedure for an inmate to grieve "any aspect of institutional life or condition of confinement . . . ." (Doc. 24, Ex. A, Attach. 1, hereafter DO 802, at 802.01.1.1.) Unless notified of an extension of time, "expiration of any time limit for a response at any stage in the process shall entitle the inmate grievant to move to the next step in the process," but extensions "at any step in the grievance process shall not exceed 15 working days." (DO 802.01.1.11.)

As described below, the process to exhaust a "Medical Grievance,"[4] differs in some respects from the "Standard Grievance Process," i.e., the process to exhaust non-medical grievances. The Court first describes the procedure for non-medical grievances, hereafter

---

[3] DO 802 became effective on July 13, 2009. See doc. 24, Ex. A, Attach. 1.

[4] A "Medical Grievance" is defined as "[a] complaint related to health care issues including but not limited to medical, psychological, psychiatric services, and related medical staff." (Definitions following DO 802.10.)

- 4 -

referred to as the Standard Grievance Procedure, before describing the medical grievance procedure.

### A. Standard Grievance Procedure

First, an inmate must attempt to resolve a complaint through informal means, including by "discussion with staff in the area most responsible for the complaint or the submission of Inmate Letters." (DO 802.02.1.1.) If the inmate is unable to resolve a complaint through informal means, he may submit an Inmate Letter, Form 916-1, to his assigned CO III within 10 workdays from the date of the action that caused the complaint. (DO 802.02.1.2.) The CO III "shall" investigate and provide a response to the inmate within 15 workdays using the Inmate Letter Response, Form 916-2. (DO 802.02.1.3.)

If the inmate does not receive a response or is dissatisfied with the response to his informal complaint, he may file a "Formal Grievance" within 5 days from receipt of the response from the CO III, or expiration of the time within which to receive a response, "using the Inmate Grievance, Form 802-1." (DO 802.03.1.1, 1.3.) The inmate must submit the Inmate Grievance form to the unit CO IV, Grievance Coordinator, who must log and assign a number to the Inmate Grievance. (DO 802.03.1.3.) Within 15 work days following receipt of a Formal Grievance, "the Deputy Warden shall issue a written response to the inmate."[5] (DO 802.03.1.5.) The decision from the unit level "shall either be 'Resolved' or 'Not Resolved.'" (DO 802.03.1.5.2.)

If the inmate does not receive a response to his Formal Grievance or is dissatisfied with the response, he may file a "Inmate Grievance Appeal, Form 802-3" to the Warden within 5 work days from receipt of the response or expiration of the time within which to receive a response. (DO 802.04.1.1.) The Warden "shall" provide a written response within 20 work days from receipt. (DO 802.04.1.3.)

Last, if the inmate does not receive a timely response to his Inmate Grievance Appeal,

---

[5] The Deputy Warden's written response "shall include" a summary of the inmate's complaint; description of the investigation of the complaint; a summary of findings; and the decision and supporting rationale. (DO 802.03.1.5.)

- 5 -

or is dissatisfied with the response, he may file an "Inmate Grievance Appeal" to the Director within 5 work days from receipt of the response, or expiration of the time within which to receive a response. (DO 802.05.1.1.) However, the inmate may not file an appeal to the Director "until the Grievance Procedure within [his] assigned unit and institution has been exhausted." (Id.) The inmate "shall submit the Inmate Grievance Appeal form to the CO IV, who shall log, process and forward all documents to the Central Office Appeals Officer within five workdays of receiving the appeal from the inmate." (DO 802.05.1.2.)[6] The Appeals Officer "shall prepare a response and submit it to the Director for signature" within 30 calendar days of receipt of the Inmate Grievance Appeal. (DO 802.05.1.4.) The decision of the "Director" is final and constitutes exhaustion of all remedies within the Department. (DO 802.05.1.7.)[7]

### B. Medical Grievance Procedure

As in the Standard Grievance Procedure, an inmate must first attempt to resolve a medical complaint through informal means, including by "discussion with staff in the area most responsible for the complaint or the submission of Inmate Letters." (DO 802.02.1.1.) If the inmate is unable to resolve a complaint through informal means, he may submit an Inmate Letter, Form 916-1, to his assigned CO III within 10 work days from the date of the action that caused the complaint. (DO 802.02.1.2.) The CO III "shall" contact the appropriate medical staff to attempt to resolve the complaint and provide a response to the inmate using the Inmate Letter Response, Form 916-2, within 15 work days. (DO 802.02.1.3.)

As with the Standard Grievance Procedure, if the inmate is dissatisfied with the response to his informal complaint, or time for a response expires, he may file a "Formal

---

[6] The Appeals Officer may return any Grievance Appeal to the unit "for further investigation or which does not meet the requirements of this Department Order." (DO 802.05.1.3.)

[7] The Director may delegate signature authority for any and all Grievance Appeal responses. (DO 802.05.1.6.)

Grievance" within 5 days "using the Inmate Grievance, Form 802-1" to the CO IV Grievance Coordinator, who must log and assign it a number. (DO 802.03.1.1 & DO 802.03.1.3.) However, unlike the Standard Grievance Procedure, upon receipt of any "Medical Grievance, the CO IV shall immediately forward the form to the Facility Health Administrator (FHA)." (DO 802.03.1.6.) Within 15 work days of receipt, the FHA shall: investigate the complaint; personally meet with the inmate to attempt to mutually resolve the grievance prior to preparing a written response; provide a written response to the inmate specifying the reasons for the decision and the date and content of the personal meeting with the inmate; and return "the documentation" to the inmate via the CO IV Grievance Coordinator. (Id.)

If the inmate does not receive a response or is dissatisfied with the response to his Inmate Grievance, he may file a Inmate Grievance Appeal to the FHA within 5 days from receipt of the response, or expiration of the time within which to receive a response. (DO 802.04.1.6.) The FHA "shall immediately forward any Medical Grievance Appeal" to the Health Services Regional Operations Director (HSROD) for investigation and response. (Id.)

Finally, if the inmate does not receive a response or is dissatisfied with the response from the HSROD, he may appeal the decision of the HSROD to the Director within 5 work days from receipt of the response or expiration of the time within which to receive a response.[8] (DO 802.05.1.1.) The inmate "shall" submit an Inmate Grievance Appeal to the CO IV, who shall log, process and forward all documents to the Central Office Appeals Officer within 5 work days of receipt. (DO 802.05.1.2.) The "Health Services Bureau Administrator shall . . . [r]eview all Medial [sic] Grievances in consultation with Department physicians and contracted physicians as necessary[]" and "[p]repare a response and submit it to the Director for signature." (DO 802.05.1.5.) The decision of the "Director" is final and

---

[8] DO 802 does not specifically set a time frame for the receipt of a response from the HSROD, but the Court assumes the time frame for a response is analogous to that for a response from the Warden under the Standard Grievance Procedure, i.e., 20 work days.

constitutes exhaustion of all remedies within the Department.[9] (DO 802.05.1.8.)

**IV.     Plaintiff's Attempts to Exhaust**

The record before the Court reflects the following:

Plaintiff returned to Rynning Unit from the hospital on August 3, 2009. (Doc. 24, Ex. A at ¶ 7. According to Plaintiff, he received a Kosher diet for one day before it was discontinued.[10]

On August 12, 2009, Plaintiff submitted an Inmate Letter, Form 916-1, to the FHA labeled "EMERGENCY GRIEVANCE PER 802.02 & 802.03" concerning the discontinuation of a Kosher diet ordered by Dr. Belcourt. (Doc. 33, Ex. 1.) Plaintiff states that he never received a response to this Inmate Letter.[11] (Doc. 33 at 1.) On September 26, 2009, Plaintiff sent an Inmate Letter, Form 916-1, to the Director. (Id., Ex. 2.) In an October 22, 2009 Inmate Letter Response, Larry Clausen of the Health Services Bureau, Central Office, answered Plaintiff's Inmate Letter to the Director, as follows:

> In your letter you asked the Director to intervene because a Kosher Diet that was ordered for medical reasons was not being provided to you. You stated that since having gall bladder surgery you've lost 15 pounds and that you sustain yourself on 6 regular meals per week and consumption of a dietary supplement.

---

[9] The Director may delegate signature authority for any and all Grievance Appeal responses. (DO 802.05.1.6.) The flow chart for the "Inmate Grievance - Medical Grievance Process" reflects a somewhat different process in which the inmate appeals to the "Deputy Director for Inmate Health Services, via the Institution/Unit Grievance Coordinator" and the "Deputy Director for Inmate Health Services or designee investigates and provides a written response, which is forwarded to Legal Services for review." (DO 802, Attach. B.) "Legal Services reviews the response and comments as appropriate[,]" and then forwards to "the Director for review and signature." (Id.) The Director's response is returned to the inmate through the "Deputy Director for Inmate Health Services and/or the Institution/Unit Grievance Coordinator," which completes exhaustion. (Id.)

[10] In his Inmate Letter to the Director, Plaintiff stated that "within days after the surgery," the kitchen refused to provide him a Kosher diet. (Doc. 33, Ex. 2.)

[11] Plaintiff also states that a response was required within 24 hours. However, DO 802 does not provide for a response within 24 hours and Plaintiff fails to cite any other policy imposing such a deadline. (Doc. 33 at 1, 2.)

- 8 -

> Through copies of this response, I am immediately alerting the Facility Health Administrator (FHA) to your concerns. Because the issues you are dealing with must be handled at a local level, the FHA can coordinate review of your current medical status, ongoing need for a Religious Diet (The Kosher Diet is not approved for use as a Restricted Medical Diet), and dietary supplements.
>
> Please direct any further concerns regarding this matter to the FHA.

(Id., Ex. 3.)

On October 26, 2009, Plaintiff submitted an Inmate Letter, Form 916-1, to CO III Dison in which he stated that he needed to "informally resolve an emergency problem regarding [his] health" based on the discontinuation of a Kosher diet for medical reasons and his ongoing weight loss. (Doc. 24, Ex. A, Attach. 2.) On October 27, 2009, CO III Dison issued an "Inmate Letter Response" in which he informed Plaintiff that he could not resolve the issue and that due to the "emergency situation" Dison had: (a) emailed Medical Records Manager Goldsmith to verify the documentation provided by Plaintiff; (b) spoken to Nursing Manager Bedford; (c) emailed Senior Chaplain Henderson and provided copies of Plaintiff's Special Needs Orders and Restricted Diet Order; (d) emailed FHA Kendall with the same information; and (e) sent hard copies of Plaintiff's documentation to the FHA. (Id., Ex. 3.)

On October 27, 2009, Plaintiff submitted an "Inmate Grievance."[12] (Doc. 24, Ex. A, Attach. 4.) CO IV Sheridan logged the Grievance and assigned it case# A12-110-009. (Id., Ex. A at ¶¶ 8, 11.) In an "Inmate Grievance Response" dated October 30, 2009, Sheridan returned the Grievance "unprocessed" because Plaintiff had failed to attempt to resolve his complaint through informal means, including discussion with staff in the area most responsible for the complaint or to submit documentation of those attempts, quoting DO 802.02. (Id., Ex. A at ¶ 12, Attach. 5.) Sheridan further stated:

> You have indicated that medical placed you on a "Kosher" diet; however, Kosher diets are considered for religious reasons. Medical diet requirement are provided through the Health Unit. You did not provide any supporting documentation. I will request medical to review.

---

[12] Plaintiff submitted his grievance on Form 802-1P, which had a revision date of February 14, 2000, i.e., it was a prior version of the Inmate Grievance Form specified in DO 802. Defendants do not challenge exhaustion based on Plaintiff's use of the outdated form.

- 9 -

> You may correct this problem and resubmit a **new grievance form**; however all time frames still apply.

(Id.)

On November 1, 2009, Dison submitted a supplemental response to Plaintiff's "informal resolution" of October 26, 2009, stating that Chaplain Henderson had responded to Dison's email stating, "Unfortunately there is nothing Chaplaincy can do since he is requesting a kosher diet for medical reasons. We only approve the special diets for religious reasons." (Id., Ex. A, Attach. 6.) Dison further stated:

> Also, that same day I attempted to verify the legitimacy of your Special Needs Order and Restricted Diet Order thru the medical records department. The medical records keeper at Rynning unit was not able to look at your file. Her supervisor S. Goldsmith advised me via email on 10/28/09 the following:
>
> "That medical diet was cancelled last week & is no longer in effect."

(Id.)

At some point, Plaintiff resubmitted his Inmate Grievance with supporting documentation. (Id., Ex. A at ¶ 14, Attach. 4.) After conferring with Deputy Warden Credio about whether to return the Grievance because not submitted on a new form, Sheridan responded to the resubmitted Inmate Grievance on November 18, 2009, stating:

> Physician Supervisor advised that on 10/22/09 he canceled the kosher diet and instituted a regular diet with 2 resource daily and ordered that you be weighed in 6 weeks; that your BMI is in the "healthy" range for a diabetic. It appears that you did not provide all the information. Medical is monitoring you which resolves this issue.

(Id.) Plaintiff did not file an Inmate Grievance Appeal from this response. (Id., Ex. A at ¶ 16.)

On November 19, 2009, FHA Kendall issued an Inmate Letter Response to a Health Needs Request (HNR) submitted by Plaintiff on November 9, 2009. (Doc. 33, Ex. 4.) Kendall stated that a new diet order had been issued on October 22, 2009 cancelling the previously ordered Kosher diet, and that the new diet provided for 2 "resources" daily with Plaintiff's weight to be taken in 6 weeks. (Id.) Kendall also stated that an "outside GI consult request" had been "submitted for review and approval" and that an appointment

- 10 -

would be scheduled after approval. (Id.)

## IV. Discussion

The record before the Court establishes that ADC had an available grievance procedure, which to some extent differentiated between non-medical and medical grievances. It is clear that Plaintiff failed to comply with the steps under DO 802 to exhaust his grievance, whether considered as a non-medical or a medical grievance.

Plaintiff attempted to informally resolve his diet issue by submitting an "Emergency Grievance" on an Inmate Letter form to the FHA on August 12, 2009, and by submitting an Inmate Letter to Dison on October 26, 2009. (Doc. 33, Ex. 1; Doc. 24, Ex. A, Attach. 1.) Plaintiff then submitted a formal Inmate Grievance on October 27, 2009, which Sheridan returned to Plaintiff "unprocessed" on October 30, 2009. (Doc. 24, Attach. A, Ex. 4.) At some point, Plaintiff resubmitted his Inmate Grievance with supporting documentation. (Id.) On November 18, 2009, Sheridan responded to the Inmate Grievance stating that the Grievance was resolved. (Id.) Nothing in the record reflects that Plaintiff thereafter filed an Inmate Grievance Appeal, whether to the Warden, pursuant to DO 802.04.1.1; to the FHA pursuant to DO 802.05.1.6; or to the "Deputy Director for Inmate Health Services, via the Institution/Unit Grievance Coordinator" pursuant to DO 802, Attachment B.

Plaintiff contends that he nevertheless properly exhausted by complying with the procedure for an emergency grievance, citing DO 802.02 and 802.03. (Doc. 33 at 1.) However, DO 802 does not set out a separate grievance procedure for emergencies. Rather, DO 802 states under "General Information" that:

> 1.8 Inmates may use the Inmate Grievance Procedure to file "Emergency Grievances".
>
> 1.8.1 An inmate may file an emergency grievance when a condition exists that, if processed through the normal grievance time frames, would subject the inmate to substantial risk of medical harm, personal injury or cause other serious and irreparable harm.
>
> 1.8.2 Sections 802.02 and 802.03 of this Department Order refer to the grievance procedure as written procedure. As such, it may not be conducive to resolving true emergencies. Inmates should utilize other available means such as letters and verbal notifications to notify staff of an emergency. The Facility Health Administrator has the final authority in determining whether

|   | a grievance will be processed as an Emergency Grievance. |
|---|---|
| 1 | |
| 2 | 1.8.3 Any Informal Complaint or Formal Grievance received by staff marked as an "emergency" shall be immediately evaluated through the chain of command to determine whether it is an emergency as defined in this Department Order and requires immediate response *outside of Grievance Procedure time frames.*[13] |

(DO 802.01.1.8) (emphasis added).

Plaintiff appears to contend that he was not required to comply with DO 802.03 in the case of an emergency, presumably based on DO 802.01.1.8.2. The Court concludes otherwise.

DO 802.02 sets forth the Informal Complaint Resolution process and DO 802.03 sets forth the Formal Grievance Process, described above. (Doc. 24, Ex. A, Attach. 1.) Subsection 802.01.1.8 provides that an inmate may file an emergency grievance and provides for immediate evaluation of "[a]ny Informal Complaint or Formal Grievance received by staff" through the chain of command to determine whether "it is an emergency" that "requires an immediate response outside of Grievance Procedure time frames." (Id., DO 802.01.1.8.3.) However, this provision does *not* obviate an inmate's obligation to exhaust the grievance procedure, even in the event of an emergency. Rather, this subsection essentially makes the common-sense recommendation that an inmate promptly bring an emergency to the attention of staff by any available means rather than to rely on the written grievance procedure to alert staff to an emergency.

The record reflects that Plaintiff submitted an Inmate Letter, labeled an Emergency Grievance, to the FHA on August 12, 2009. (Doc. 33, Ex. 1.) Plaintiff states that he never received a response to that Inmate Letter and some six weeks later, Plaintiff sent an Inmate Letter to the Director. (Id., Ex. 2.) The record before the Court does not reflect that Plaintiff's August 12 Inmate Letter was received, and if received, determined by the FHA to constitute an emergency requiring an immediate response outside the Grievance Procedure time frames. Moreover, nothing in the record reflects that Plaintiff timely filed a Formal

---

[13] Contrary to this provision, DO 802 does not define "emergency".

Grievance after expiration of the time within which to receive a response to the August 12 Inmate Letter, nor did DO 802 provide that an inmate could exhaust the grievance process by submitting an Inmate Letter to the Director.

Prisoners must comply with a prison's grievance procedures to properly exhaust. Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009). Plaintiff does not assert that he lacked access to the appropriate forms, which might excuse failure to exhaust. See Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009). Indeed, Plaintiff subsequently submitted an Inmate Letter to CO III Dison, also labeled an emergency, and then timely filed a Formal Inmate Grievance on October 27, 2009, which Sheridan returned to him "unprocessed." It is undisputed that Plaintiff timely resubmitted his Formal Inmate Grievance, to which Sheridan responded on November 18, 2009, stating the Grievance was resolved. The record does not reflect that Plaintiff thereafter filed an Inmate Grievance Appeal whether to the Warden, pursuant to DO 802.04.1.1; to the FHA pursuant to DO 802.05.1.6; or to the "Deputy Director for Inmate Health Services, via the Institution/Unit Grievance Coordinator" pursuant to DO 802, Attachment B. (See Doc. 24, Ex. A at ¶¶ 5-6, Ex. B at ¶¶ 4-6.) Moreover, even assuming Plaintiff timely filed an Inmate Grievance Appeal to the Warden, FHA, or Deputy Director for Inmate Health Services, Defendants have proffered evidence to support that Plaintiff did not thereafter file an Inmate Grievance Appeal to the Director in compliance with DO 802. (Id.) In short, Plaintiff failed to properly exhaust the Formal Inmate Grievance he did file through the Director level. As a consequence, the Court concludes that Plaintiff failed to properly exhaust prior to commencing this case. Accordingly, the Court will grant Defendants' motion to dismiss without prejudice. Because this action is being dismissed, Plaintiff's motion for injunctive relief will be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge as to this action is withdrawn.

(2) Defendants' motion to strike Plaintiff's supplemental response is **denied**. (Doc. 37.)

(3) Defendants' motion to dismiss for failure to exhaust is **granted**. (Doc. 24.)

(4) Plaintiff's motion for injunctive relief is **denied**. (Doc. 3.)

(5) The Clerk of Court must enter judgment of dismissal for failure to exhaust without prejudice.

DATED this 9th day of August, 2010.

G. Murray Snow
United States District Judge